And I see we have Mr. Pommel for the appellant. And the procedure we're following today is that if you would like to, when you're arguing, you can take off your mask. But when you're done arguing, you should obviously put it back on. Whenever you're ready. Thank you, your honors, and may it please the court. To set the context, Nicole Perkins is a case manager with the city's Human Resources Administration. One of the essential functions of her job is constant communication and interactions with clients to perform and provide food assistance, rental assistance, and so on. Because Nicole Perkins is deaf, her primary language is American Sign Language, and she requires accommodations such as ASL interpreters to fully perform the job. The city denied those accommodations outright or provided them through an unreasonable delay. With that backdrop, I would like to focus on three points. First, the request of a video phone, or VP for short. Second, the city's response. And third, how the fact intensive nature of these cases almost always send them past the discovery stage and even the summary judgment stage. Returning to that first point, the video phone. Nicole Perkins started work with HRA, the Human Resources Administration, in July 2019. One month beforehand, she requested a video phone to perform her job. A video phone, as the name implies, is either a monitor or screen in conjunction with a telephone, so a deaf user can make phone calls to a hearing person. An interpreter would be there on the other line, would receive the sign language and voice that to the hearing person, and vice versa. Now, accepting the allegations is true. I'm not sure I understand why you need anything other than the usual kind of telephone for a person who is deaf to place a telephone call, you press in the numbers. Yes, you press in the numbers, but for a deaf person to communicate, Nicole Perkins cannot audibly voice a response. So the screen would have an interpreter pop up, and Nicole Perkins, using ASL as her primary language, would use sign language, which requires hand gestures and so on. Right, as opposed to plugging in the numbers on the phone? Well, no, she could plug in the numbers on the phone herself, but to have that communication with another individual, she cannot communicate with a hearing person without an interpreter. Let me, I think you would agree that the law is, as it relates to a delay claim for a reasonable accommodation, that you either have to show discriminatory intent, which I think you correctly argue also includes deliberate indifference. So how did the allegations show that the city, I think even if you just look at the complaint, it seems like almost every two months, they were trying to rectify the ongoing problems, usually in a deliberate indifference scenario. There's just complete silence. There's nothing, that would be the classic deliberate indifference when they're doing nothing, but first they gave her the phone, then they gave her the cradle point, then the cradle point didn't work, and they tried to fix it. I can go through the dates with you, but I think essentially it boils down to every two months starting in October, and then the pandemic happened. So can you address that? Of course, and Judge Bianco, I have three responses to that. First, the discriminatory intent standard. So we would say that there's nothing in the elements of the claim or the statutes that requires discriminatory intent. I mean, for example, with deliberate indifference, that's solely for compensatory damages to understand whether a spending clause statute and a federal funding recipient is aware that they're intentionally violating the law. So in exchange- I looked at your complaint, it was actually interesting. In your complaint, you cited the law, I forget what paragraph it is, I think it was 75, where you laid out the law and said it requires discriminatory intent. So I thought you conceded that in your complaint, including deliberate indifference, but the idea that it doesn't require either, which we can debate, I don't think you preserved that. But why don't you address why the allegations would satisfy that standard? Of course, and that goes to my second and third response. Deliberate indifference or discriminatory intent often invokes even benign neglect and apathetic attitudes. And I think there are five key facts that support both those standards. First, Nicole Perkins requested the video phone in June. And the entire time, this is the second fact, the city knew all along that a video phone required a cradle point, which is a wireless router to fully function. Now that video phone with a cradle point was not provided until five months later. And it was only the same week after Nicole Perkins threatened an EEOC action. And then even after the video phone and the cradle point were provided, there were routine problems with the functionality. And Sorensen, which is a third party company that services video phones, also participated in email exchanges and phone calls. And even said, and this is paragraph 44 of the amended complaint, that the city was not very helpful. And even the district court looked and said that there was admittedly a real breakdown in communications because the city didn't respond to emails. When you say the city didn't respond, the city retained a service provider, right, which provides this kind of stuff, and they may have been unresponsive. But why not say that the city was responsive by hiring an expert agency to provide this? And if the city provided services that were incompetent, that means that's not the only city services that are incompetent. You're right, that may be true, but Sorensen was the company that became involved to install the VP. And they had communications with the city, and also admitted that they had gridlock of troubleshooting and fixing the functionality of the video phone. No one says the city told Sorensen, don't bother with this, it's impossible, it's difficult, it's expensive, whatever. They apparently gave Sorensen carte blanche to do what was necessary to make these devices work for your client, as she was entitled to. Not exactly, Your Honor, because Sorensen needed to troubleshoot the device and understand the city's network protections and firewall. And that's when there were long gaps of time of the city not responding. Your problem is not with Sorensen. Your problem is that Sorensen, when they reached out to the city for the help that they needed to correct these problems, was met with silence. That's essentially what your allegations are? That's precisely right. So it's not only Nicole Perkins contacting the city and receiving white noise. It was also the fact that Sorensen, a third party company, also got involved and tried to communicate with the city and didn't receive a response. And I see my time is almost up, so to get to that third point really quickly before rebuttal. Very often these cases are resolved, even at the summary judgment stage or later on, because of the fact-intensive nature of the dispute. Even what constitutes a reasonable delay depends on the circumstances. And there are no hard and fast rules to determine whether one month, ten months, or so on constitutes an unreasonable delay. And even more so, we have the facts here of the EEOC threat, the five month delay, and even the fact that the city knew all of- Can I just ask you, I mean, what about the circumstances of this case do you suggest that the delay here was unreasonable? Given that we are talking about that the phone was in fact provided and obviously not working optimally at various points, but it's not a situation where a request is made, nothing happens for six months. I mean, what about this scenario, which does seem to point to perhaps incompetence, but what about this scenario pushes it over to the unreasonable edge? I think what pushes this to the unreasonable edge, and I see my time is up, may I briefly respond, your honors? Yeah, thank you. I think what pushes this over the edge unreasonable is the fact that a reasonable inference to be drawn is the city, Nicole Perkins, or one of the others, set a start date of July. And Nicole Perkins requested an accommodation beforehand. So it's unclear why Nicole Perkins would start with the city in July if she does not have one of the accommodations she requested. And again, the entire backdrop is, and this is allegation 53, is that the city had dealt with a deaf employee beforehand that required a video phone that required a cradle point. So at least it requires discovery to understand why the city took multiple months to finally provide a video phone with a cradle point if they knew all along what they needed. You provided, I believe, only one example of a situation in which your client was not able to communicate at all. And that was in a really highly atypical situation with a person she was communicating with who did not speak English. So that sounds like a really attenuated line of communication. And if you mentioned that as the only example, what that tells me is, it is the only example. That that's the only instance in which she simply could not reach or deal with her client. Your Honor, I know of course my time is still up. May I briefly respond? Of course. It's okay. The presider is very indulgent. Always. I appreciate it, Judge Monaco, and I appreciate it, Judge Jacobs. The example I believe you're referring to is for even a different accommodation, that she required video remote interpreting on a device. That's true, but that's part of the case. It's of course a part of the case, but I think one of the core allegations is the video phone. If you look at paragraph 19 where accepting is true, one of her core functions is constant phone calls and interactions with clients. And if you look at even paragraph 26, which is when she threatened an EEOC action, she even says that she has constantly needed to use her personal cell phone to make calls and use of data and rely on other co-workers to make calls for her. So there's information in the complaint, except it is true, that making these calls and interacting with clients is an essential function. We can take judicial notice of the fact that the city was plunged into crisis in March of 2020. To what extent can we properly take that into consideration in deciding whether the communication services would naturally be disrupted and frustrated for everybody in the city in evaluating whether the seriousness of the deprivation that your clients suffered. Absolutely, your honor. I think there's two buckets to look at that. I think the first one is the COVID-19 pandemic, of course, in March 2020, where a core part of the allegations occurred many months beforehand, where she requested the accommodation in June 2019, and it wasn't fully provided until November 29th of 2019. So there's that five month delay where we have the allegations that the city didn't do what they needed to do. But even more so, I think the second bucket is the fact that once the video phone and the cradle point were provided, that there were delays in terms of communicating back and forth. Now, of course, in discovery, the city could say, naturally, that we were dealing with a pandemic and we were transferring workers from in-person to remote, that we had issues with our firewall. But there's no allegations- That's for a trial and for a jury. That would be for trial and a jury. If they would proffer such responses to say that they couldn't communicate- You alleged in the complaint that your client wasn't even using, maybe I'm wrong about this, the VP device during the pandemic from her home, that was for the office, not for the home, right? Am I wrong about that? I thought that was one of your allegations. It appears, specifically, if you look, there's the big time jump between- Paragraph 47. Yes, 47 to 49, so she returned home and the video phone was at the office at the time. Right, so it wasn't that they didn't do anything during the pandemic, she didn't need it during the pandemic, right? She didn't need it during the pandemic, but she did return, as we see on paragraph 49 in September. It was working when she returned full time, I guess, in September of 2021, right? The reasonable evidence to be drawn that it wasn't working consistently, as we see in paragraph 45. Sorenson learned that her VP was inconsistent, and that was because individuals on the other end were having communication difficulties. So by all accounts, from Ms. Perkins' perspective, there were no issues with the video phone, but the other user, the hearing user, was having trouble understanding her. Okay, all right, thank you. Yes, thank you very much. All right, we'll now hear from the city, Ms. Jerome. Good morning, may it please, excuse me, good morning, may it please the court, Eva Jerome from the New York City Law Department. On behalf of Apelli, this case can absolutely be dismissed on the already amended counseled pleadings. The timeline that Ms. Perkins herself sets out simply does not support her claim. Let me before you, should we start the July, the June request? Yes. Because she was conditionally hired, right? That's not alleged in the complaint at all, your honor. Okay, so why would she be making a request in June? I don't know, it's not in the complaint, but let's assume she admits it as an informal complaint. All right, let's start with August. Okay, well, right, she starts- Let's start with August for present purpose. So the allegation is that they allege that the city knew that a cradle point was needed because they had another deaf employee. So providing the device with no cradle point in October, again, if you credit their allegation, the complaint is a non-event because she's not going to be able to use it, right? That's true, but- All right, and then she gets the cradle point in November. So again, construing it for most favorable to her, even with her official request in August to November, that was a four-month delay with no explanation, or am I wrong about that? I believe there was an explanation, your honor, that Ms. Perkins pled that in October, she alleges that the city said that the city was trying to come up with a permanent solution because it knew that the cradle point was not a permanent fix. I know, but why wouldn't they give her the cradle point in the interim? They knew the other employee was able to use it with the cradle point only, right? So that's, it could be they were looking for a permanent solution. That doesn't explain why it took four months for them to give her one with a cradle point, right? It does show, your honor, an engagement with the process and absolutely no indifference by any means. They were trying to come up with a solution. They bought the phone in September. But if they know it's not going to work, that seems pretty indifferent to me, but- I was functioning in January of 2020, and nothing happens for a month. They give her a replacement cradle point. And then there's the first email, February 13th. This is Sorenson emailing the city. My technical could not get your IT people cooperating. That's why my staff couldn't get this done. So Sorenson is complaining that the city is basically silent, right? Okay, so the February 13th email said we need to see your configuration. And five days later, HRA does respond and gives configuration information. I know, but a month went by that prompted that email. And then there's a response. And then she reports poor quality in March. And then, as he referenced, and this is in the complaint, nothing happens for another month. And in April, Sorenson emails Ms. Perkins and says, the cities aren't very helpful. No one is replying to our emails. So that's another month of silence. So there seems to be a lot of silence. And the district court even said, admittedly, there was a real breakdown in communication concerning the lingering issues, so I guess the question is, why is that not enough at the motion to dismiss stage? I think they correctly note every one of your cases except for one were all summary judgment cases, right? Yes, your honor, I believe that's an accurate count. Why shouldn't that be enough to set a plausible claim that this amounted to indifference? Because if you take the periods of time in which there was no communication, most you have a month, and the cases that state that a delay needs to show indifference, much longer periods of time were held not to demonstrate deliberate indifference. And it can't be indifferent if the city is actually responding, maybe not perfectly, but perfection is not required, not even at the pleading stage. And the March 4th email about the freezing and blurry, the city did actually say, we have asked our chief information systems office for advice. It shows a connection between October and March of a back and forth and trying to resolve the problems as they came up. And it absolutely does not, cannot show indifference. And then the pandemic hit a week later. And this court, of course, can take judicial notice in the, you know, plausibility is context specific, as you know. And the, despite perhaps not taking into allegations, it's true that the city didn't respond to Sorenson's emails for, but that by the time she returned to the office, the phone was working. During the pandemic, at the height of utter chaos and, you know, upending of the communications as we know it, does not mean that. I think their argument would be that even before the pandemic, there was enough delay and indifference to support a claim, even giving the city, obviously the benefit of the pandemic. What would the answer be to, based upon the pleadings, to why she made the request on August 15th for the phone, that she didn't get one until with a cradle point. Again, if they knew that a cradle point would be necessary to operate the phone from the other deaf employee, why she didn't get one until November 29th. What's the answer to that? I obviously don't have an answer for that, but I'll point out that that amount of time, just that amount of time is three and a half months and it's just not long enough, even on its face at the pleading stage, to be able to stay a claim for discrimination based on delay. And the fact is that she got it. The city never refused her request. It gave her what she wanted and it tried every so often as the problems came up to try and fix them. They allowed a third party to come into its IT department, Sorenson, to try and fix it. HRA escalated it to its chief information systems office. These allegations by themselves reflect a lack of indifference. A very lack of- Can I ask you a legal question? And I think they did concede this, but I've been thinking about it and I don't think we've ever decided in a, we've said that intent is not required for, discriminatory intent is not required for a reasonable accommodation claim, right? We've said that. There's a, and you can correct me if I'm wrong, there's a host of district court cases that have said, but when it's not a denial until the way, then you have to show discriminatory intent. Yes. But I don't think we've ever said that, right? The circuit has affirmed some of those circuit cases, although in- Yeah, there was one summary order that had a sentence in it. I don't remember the name of the case. But other than that, we've never, in a published opinion, said whether or not in a delay situation, you have to show that it was discriminatory intent that motivated it, right? That's right. But even if the standard is deliberate- I guess my question is why. Why would there be a different standard in a delay? If the whole idea that the reason we don't require intent in a reasonable accommodation claim is because if you're disabled and you're asking for an accommodation and it's reasonable and it's denied, then under the statute, it is based upon your disability because you're requesting it for your disability. So that's why we have said no intent. So if that's the theory, why would it be any different for a delay? Why would you have to show intent for a delay in that? I hope, if I'm understanding your question, I believe a delay with examples of trying to achieve the goal of getting the accommodation is completely different than a flat out refusal. Well, that wouldn't be the law. The law would be if it's a delay even with nothing, you would still have to show intent if we followed the district court cases. So I was thinking of, for example, if the city had said, no, we're not providing you with the phone on the day one, then under our law, you don't have to show discriminatory intent. If it's unreasonable, they win. But if the city says, we're going to give you that, but then they do nothing for five months, six months. You can pick the amount under the district court cases. In that situation, they would have to show that that was motivated by discrimination, some type of. I don't know if I understand why that would be, but you're missing something. I'm only guided by the decisions themselves, of course, too. All right, I'm just trying to understand the rationale behind it, but okay. I'm sorry I wasted your time on that. No, you didn't. I didn't mean to imply that at all. I think there is a difference because the courts have recognized bureaucracy's processes. That this is a real world situation we're dealing with. And that a refusal outright is different from attempting to try and go through the red tape and get the things that are being requested, which is what happened here. So that's the difference. All right, all right. Thank you, Ms. Truong. Thank you. Okay, Mr. Humley, you have three minutes in rebuttal. Thank you, Your Honor. And also, I appreciate the extra time at the end of my argument beforehand. To start off, I want to start with the June 2019 request, as brought up in the other side's argument. There is an allegation in the complaint, paragraph 18, that Nicole Perkins requested an accommodation in June. Even a reasonable inference to be drawn is that Nicole Perkins engaged in the interview process with accommodations. And even once a conditional job offer was extended, certainly the city has a mandatory obligation to participate in the interactive process. You should have alleged when the conditional offer came, right? There isn't any indication of why she was requesting it in June, right? No, there's no specific indication, but I think at the same time- So how do we know when she got the offer? We don't know specifically when she got the offer, but at minimum, even in June, let's say the conditional offer came even a day before she started. The city has knowledge that Nicole Perkins requires accommodations. So at minimum, when she started her employment, the city had no plan to have a video phone with a cradle point for her. Which again, contrary to fact 53, they knew along that she needed that. Why are you assuming that a cradle point is the solution? Because when the cradle point was installed, it didn't work very well. And no one's saying it wasn't a cradle point, it was. Didn't work very well and had to be moved. And when it was moved, it stopped working altogether, as I recall. So, I mean, surely there's a difference between a delay during which people don't care and do nothing. And a delay in which people are trying to deal with problems, including, I might add, security. For this particular agency, there are a lot of highly confidential things going on. These are alcoholism, child custody. These are things in which security really shouldn't be compromised. So we're not just talking about whether somebody gets a phone. We're talking about whether somebody can make something work with considerable impediments, which are referred to in the complaint. Of course, Your Honor, and I think with the hindsight of the prior deaf employee, at least the city, the reasonable inference to be drawn, of course, is that they had a road map of how the cradle point would work with the video phone. And even guidance from the EEOC and case law says that if a particular accommodation is failing, the employer still needs to provide something. How do we know how long it took for the other deaf employee to get a working system? We don't have that allegation in the complaint, but even if we stick with Nicole Perkins, is that- It could have taken as long as this, but then there's no explanation as to why the city didn't try a cradle point first, or even try a different solution beforehand. Instead, in October, they just provided the video phone, which they would know wouldn't work at all. And with that, I just want to, if I could have a brief moment to conclude. The communication with clients is an essential function of the job. As we see in paragraph 59, this had tangible outcomes. Nicole Perkins had to cancel appointments, cases were taken away from her, and even on page 34 of the joint appendix- Sorry, but you just said she had to cancel appointments. I believe you listed one appointment that had to be canceled, and that's one in which, in addition to having the interpreter, the ASL interpreter, there had to be a Korean language interpreter, so that's an atypical situation. You haven't alleged any other appointments that had to be canceled. No, that's true, Your Honor, but even specifically focusing on the video phone, we do at least have the allegations that she needed to use her personal cell phone, rely on co-workers to make calls for her. And on page 34 of the joint appendix, she even called out of work several times because of what she thought was discrimination. So certainly with the video remote interpreting and going with the Korean speaking client, there was just that one specific allegation. But even globally, we see that there are tangible outcomes for not being accommodated. Thank you very much, Your Honor, I appreciate it. I'm sorry, just one more question. Just to clarify, with regard to whether or not there is a requirement of showing discriminatory intent in a delayed accommodations case, I think this came up in your main argument, but I just wanted to get clear on what your position is, whether or not that's required. Our position is that it's not required, and Judge Bianco correctly noted that we threw the kitchen sink in our complaint, and in paragraph 75, we posit the defendant may argue. But I think given the looking at the statute and the elements, there's no requirement for intent. And when we've even looked at deliberate indifference, that has been used solely to determine whether we can move from nominal damages to compensatory damages, because a federal funding recipient is aware that they knowingly violated the law. Thanks so much. Thank you. We'll reserve decision. Thank you both, have a good day. Thank you.